IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** § <br> § <br> **Plaintiff,** § <br> § <br> v. § <br> § <br> **WILLIAM GLEN BAKER,** § <br> **MICHAEL BOWEN,** § <br> **CANNON OPERATING COMPANY LLC,** § <br> **NORTH TEXAS MINERALS LLC, and** § <br> **CHOL KIM a/k/a BRANDON KIM,** § <br> § <br> **Defendants.** § <br> § | Civil Action No. 3:22-cv-1415 |

# COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Defendants William Glen Baker ("Baker"), Michael Bowen ("Bowen"), Cannon Operating Company LLC ("Cannon"), North Texas Minerals LLC ("NTX"), and Chol Kim a/k/a/ Brandon Kim ("Kim") (collectively "Defendants"), and respectfully shows the Court as follows:

## I.
## SUMMARY

1. Between January 2018 and September 2020, Baker, Bowen, and Cannon raised approximately $2,182,687 from at least 140 investors through the fraudulent and unregistered offer and sale of securities—four offerings of working interests in oil-and-gas wells in Oklahoma. In one of these offerings—the drilling of a new well, the Mustang 2—the written offering materials, drafted by Baker and edited by Bowen, misrepresented the track record and

performance of Cannon's prior wells in the same field, failed to disclose that sales commissions would be paid, and misstated how investor funds would be used.

2. Baker and Cannon also improperly commingled Mustang 2 investor funds with funds invested in the other wells. Further, Cannon used investor funds to pay Baker, Bowen, Kim (a Cannon salesman), and Cannon's other salesmen undisclosed sales commissions. Baker, who controlled Cannon's bank accounts, also misappropriated investor funds to pay personal and non-business expenses, including travel, dining, and entertainment. Baker's expenditures vastly exceeded the 15% cap on investor funds the Mustang 2 offering materials earmarked for overhead and offering expenses. Finally, Baker, Bowen, and Kim offered and sold Cannon's Mustang 2 offering without being registered as brokers.

3. The other three offerings for which investor funds were raised involved the drilling of another new well, the conversion of an existing well into a saltwater disposal well ("SWD"), and the recompletion of another existing well into a different producing zone. For these offerings, Cannon, Baker, and Bowen communicated the material terms to prospective investors through phone calls and emails, using simplified descriptions of the well projects. Cannon and Baker, however, did not use the investor funds they raised for the stated purposes on those projects.

4. In addition, in 2019, Baker conducted an unrelated offering through a separate company that he owned, NTX. In this offering, NTX "sold" a mineral interest that it purported to own to an investor. NTX, however, did not actually own the mineral interest. The investor paid $126,000 for the interest, but received nothing. Baker simply pocketed the entire investment and used the funds to pay personal expenses or expenses related to Cannon.

## II.
## JURISDICTION AND VENUE

5. The Court has jurisdiction over this action under Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6. The Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

7. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the transactions, acts, practices, and courses of conduct alleged in the Complaint occurred within this District. In addition, venue is proper in this District because all of the Defendants reside, conduct business, and/or maintain principal places of business within the District.

## III.
## DEFENDANTS

8. **William Glen Baker**, age 52, resides in Terrell, Texas. He is the owner, managing member, and president of both Cannon and NTX. In 2006, Baker was convicted in Dallas County for unlawfully carrying a weapon and drug-related charges. In 2020, the Ohio Division of Securities issued a cease-and-desist order against Baker for selling securities without a license. Baker does not hold any securities licenses and is not registered with the Commission in any capacity.

9. **Michael Bowen**, age 39, resides in Dallas, Texas. He was the Chief Operating Officer and sales manager of Cannon until he departed in September 2018 to become the president of an unrelated oil and gas company. In 2018 and 2019, the Commission sanctioned Bowen for selling securities issued by a number of companies, including Breitling Oil and Gas Corporation ("Breitling"), Crude Energy, LLC, and Patriot Energy, Inc., in unregistered offerings, and for selling securities without being registered as a broker. The Commission: (a) ordered him to cease-and-desist from selling securities without being registered as a broker, in violation of Section 15(a) of the Exchange Act, and from selling securities in unregistered offerings, in violation of Sections 5(a) and 5(c) of the Securities Act; (b) ordered him to pay $2,036,012.96 in disgorgement and prejudgment interest (which he has not paid); (c) ordered him to pay a $50,000 civil penalty (which he has not paid); and (d) barred him from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal adviser, transfer agent, or nationally recognized statistical rating organization and prohibited him from serving or acting as an employee, officer, director, or member of an advisory board, investment adviser, or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter. *In the Matter of Robert L. Baker, et al.*, Securities Act Release No. 10665, 2019 WL 3484124 (July 24, 2019); Securities Act Release No. 10471, 2018 WL 10392765 (March 22, 2018). Bowen does not hold any securities licenses and is not registered with the Commission in any capacity.

10. **Cannon Operating Company LLC ("Cannon")** is a Texas limited liability company founded and owned by Baker, with its principal place of business in Garland, Texas. Cannon was incorporated on October 20, 2009 as an oil and gas exploration and production company. It has been sanctioned by multiple state securities regulators, including: (1) in 2015,

by South Carolina, for selling unregistered securities through unlicensed agents and engaging in a scheme to defraud; (2) in 2019, by Indiana, for offering or selling unregistered securities through a scheme to defraud (Cannon was ordered to pay more than $210,000 in restitution and penalties and was barred from the state's securities industry); and (3) in 2020, by Ohio, for selling securities through unlicensed salesmen and failing to disclose Baker's prior felony convictions and Cannon's prior administrative orders. Neither Cannon, its securities, nor its securities offerings have ever been registered with the Commission.

11. **North Texas Minerals LLC ("NTX")** is a Texas limited liability company that Baker formed in 2017. Baker owns and controls NTX, which maintains its principal place of business in Garland, Texas. The company ceased operations in late 2019, but still exists. Neither NTX nor its securities offerings have ever been registered with the Commission.

12. **Chol Kim a/k/a/ Brandon Kim**, age 42, resides in Dallas, Texas. He is a former salesman for Cannon and NTX. Kim does not hold any securities licenses and is not registered with the Commission in any capacity.

## IV.
## BACKGROUND FACTS

13. In 2009, Baker founded Cannon and, through it, offered and sold working interests in oil and gas prospects in Texas, Louisiana, and Oklahoma to investors nationwide. These oil and gas working interests constituted securities under the statutory definitions in the federal securities laws. In addition, Cannon's offerings constituted "investment contracts" under the federal securities laws because Cannon's investors purchased their working interests with personal checks, wire transfers, or through self-directed IRA accounts, for the purpose of investing in a "common enterprise" to earn profits from oil and gas production based on the efforts and expertise of Cannon and its employees.

14. In January 2018, Cannon and Baker began raising money for four separate well offerings in the Shawnee Field in Pottawatomie County, Oklahoma, where Cannon already operated several wells. These four projects included:

- Mustang 2: This project was for a new well to be drilled in the Shawnee Field and was the tenth Cannon-sponsored oil and gas drilling program.

- Shawnee 1: Cannon had previously drilled this well, but proposed converting it to a saltwater disposal well.

- Shawnee 3: Cannon had previously drilled this well, but proposed recompleting the well into another producing zone.

- Shawnee 5: This project was for a new well to be drilled in the Shawnee Field.

**A.   Defendants solicited investors.**

15. From approximately January 2018 to September 2020, Cannon raised $2,182,687 from at least 140 investors in 42 states in connection with these four offerings (the "Cannon Offerings"):

| Well | Investor Funds Raised |
|---|---|
| Mustang 2 | $1,538,152 |
| Shawnee 1 | $164,812 |
| Shawnee 3 | $89,128 |
| Shawnee 5 | $13,750 |
| Unclear[1] | $376,845 |
| **Total** | **$2,182,687** |

16. For the Mustang 2 and the Shawnee 5 wells, Cannon salesmen solicited

---

[1] For these investor funds, it is not possible to determine the specific offering the investors purchased because Cannon and Baker commingled investor funds and because investors did not specify on their check or wire transfer the well to which their payment pertained.

prospective investors by cold-calling potential investors from purchased lead lists. Cannon also generally advertised investment opportunities on the company's website and used targeted internet marketing like Google Ads and Facebook.

17. From January 2018 to September 2020, Cannon employed 18 salesmen, including Kim. Even though Baker and Bowen were officers of Cannon, they also directly solicited investors. None of Cannon's salesmen, including Baker, Bowen, and Kim, were registered as brokers.

18. Because the Shawnee 1 and 3 projects involved the conversion and recompletion of existing wells, Cannon, Baker, and Bowen contacted existing Cannon investors, including those who had originally invested in the Shawnee 1 and 3 wells, to solicit their investment and participation in these subsequent operations.

**B.   Baker and Bowen created the offering materials.**

19. Baker and Bowen prepared the written offering materials for the Mustang 2 well, with Baker drafting and Bowen reviewing and editing them. The written materials included a Private Placement Memorandum ("PPM") and a marketing brochure referred to as the "Prospect Book." Cannon, Baker, Bowen, Kim, and the other Cannon salesmen sent these two documents (collectively, the "Mustang 2 Offering Materials") to prospective investors.

20. When raising funds for additional work on the Shawnee 1 and 3 projects, Baker prepared single-page information sheets rather than formal offering materials. These information sheets described, respectively, the conversion and recompletion projects. Cannon and Baker sent these one-page summaries, along with an election form, to Cannon's existing investors. If investors chose to participate in the production generated by the subsequent operations, they returned the completed election form along with their investment.

21. Cannon did not prepare formal written materials for the Shawnee 5 project either. Instead, Baker provided generic information about this proposed new well to the salesmen for them to convey to prospective investors during their telephone solicitations.

**C.  Cannon's Mustang 2 Offering Materials contained misleading information.**

*Historical production*

22. The Mustang 2 Prospect Book contained misleading information about the actual production of oil and gas from three of Cannon's prior wells—the Shawnee 2, 3, and 4 wells. These wells were located in the same field as the Mustang 2 well's proposed location. Cannon's Mustang 2 Prospect Book claimed that Cannon's Shawnee 2, 3, and 4 wells had high initial production when they were first drilled and that they "continued to produce at massive rates." This representation misled investors into believing that production from the Mustang 2 would also be high.

23. Actual production from the earlier three Shawnee wells, however, declined dramatically after the initial production. Baker and Bowen knew this: offering materials for an earlier 2016 Cannon project had accurately described the production declines of the Shawnee 2 and 3 wells in detail. In addition, in April 2018, when the Mustang 2 offering began, Baker and Bowen knew, or were extremely reckless in not knowing, that the Shawnee 2 and 3 wells had not been "massively" producing and had in fact been offline for March and April 2018. Baker and Bowen omitted these details from the Mustang 2 Offering Materials and falsely represented that the wells had continued to produce at "massive rates."

*Segregated bank accounts*

24. The Mustang 2 PPM promised investors that "proceeds from the offer and sale of the Units will be deposited into a segregated bank account in the name of the Program." Baker,

who controlled Cannon's bank accounts, never opened a separate account for Mustang 2 investor funds. Instead, all Mustang 2 investor funds were deposited into Cannon's general operating account.

### D. Cannon, Baker, and Bowen did not use the funds as represented.

*Mustang 2*

25. The Mustang 2 PPM stated that Cannon would use 85% of investor funds for "Program Costs" and 15% for a "Management Fee." According to the PPM, Program Costs included the drilling and testing of the well, completion costs, third-party geological, engineering, and consulting expenses, and land costs. The Management Fee, according to the PPM, included offering expenses, overhead, and management associated with the initial operations. The PPM did not define what was included in the term "overhead."

26. Cannon did not spend investor funds as promised in the PPM. Due to the commingling of investor funds from multiple projects, combined with poor recordkeeping for all of the projects, it is not possible to tell exactly how much Cannon spent on Mustang 2, or any other well project. Regardless, Cannon's offering, overhead, and management expenses on the Mustang 2 vastly exceeded the 15% cap.

27. Baker misused $691,756 of investor funds in the Cannon account on various personal expenses such as retail shopping, travel, meals, entertainment, child support, medical bills, and car expenses. In some cases, Baker withdrew cash from Cannon, while other times he directed Cannon to purchase the personal items directly.

28. Bowen misused investor funds from January-October 2018 when he was sales manager because he was in charge of paying commissions to the salesmen on the completed sales. He knew, or was extremely reckless in not knowing, that the commissions were not

authorized by the offering materials or disclosed at any point to investors and that the commission payments exceeded the 15% cap on the offering, overhead, and management expenses for the Mustang 2.

*Shawnee wells*

29. Cannon and Baker also misused investor funds for the other three wells. Although Cannon raised $253,940 to pay for the subsequent operations on the Shawnee 1 and 3, Cannon never completed those projects. Plus, although Cannon and Baker solicited investor funds to drill the Shawnee 5 well, they never actually drilled it.

**E.   Defendants omitted material information.**

30. The Mustang 2 Offering Materials, which were prepared by Baker and Bowen, omitted material background information about Cannon, Baker, and Bowen.

31. The Mustang 2 Offering Materials failed to mention Bowen whatsoever, including that he was Cannon's Chief Operating Officer. This omission was designed to prevent investors from learning about Bowen's prior securities violations. Bowen knew, or was reckless in not knowing, about these omissions because he helped prepare the Mustang 2 Offering Materials.

32. The Mustang 2 Offering Materials also failed to disclose other material, negative information, including[2]:

- Orders from the Texas Railroad Commission against Cannon for violating surface equipment removal regulations (2013) and for safety and pollution control regulations (2015).

- A 2015 cease-and-desist order from the South Carolina Securities Commissioner against

---

[2]   The Mustang 2 Offering Materials also contained inconsistent information. The PPM touted Baker's years of oil and gas experience, claiming Baker had been "in the oil and gas business for 18 years," and that he "has drilled and completed over 150 wells" since 1999. However, the Prospect Book claimed that Baker had drilled and completed more than 350 wells.

- Cannon for selling unregistered securities.

- Baker's 2006 conviction in Dallas County for unlawfully carrying a weapon and various drug-related charges.

33. Cannon, Baker, and Bowen failed to disclose the payment of commissions. Bowen was Cannon's sales manager and determined the amount of commission paid on each sale, including payments to Baker and Bowen for their respective sales. Baker and Bowen also prepared the Mustang 2 Offering Materials, and Baker prepared information sheets for Shawnee 1 and 3, none of which included a reference to the payment of commissions. As a result, Cannon, Baker, and Bowen knew, or were reckless in not knowing, that Cannon's offering materials failed to disclose to investors the payment of sales commissions.

### F. Defendants Baker and Cannon provided misleading or incomplete updates on the status of the projects.

34. As investor funds were deposited into Cannon's general operating account and spent on personal expenses and excessive overhead, investors began questioning Cannon's failure to pay returns. Baker, as well as Cannon's salesmen (who were following Baker's instructions), repeatedly made "lulling" statements to pacify investors. They frequently claimed that rain or equipment problems had delayed progress. But they had other excuses, as well.

35. For example, in a March 9, 2019 update posted on Cannon's investor portal, Baker stated:

- With respect to the Mustang 2, Cannon's "driller" was "continuing to drill" for other customers but that those wells were "relatively shallow," so the driller should be finished with his other customers by the third week of March. Baker further claimed to have contacted other drillers, but they were not available until the end of April 2019.

- With respect to the Shawnee 3 recompletion, Baker would begin work to restore production once he had placed some interests.

36. In a January 25, 2019 update, Baker claimed that the Shawnee 1 had been "partly

operational" since January 1 as a saltwater disposal well and was accepting disposal water.

37. These excuses were not true. Cannon never drilled the Mustang 2 well. In fact, Cannon did not apply to the Oklahoma Corporation Commission for a drilling permit for the Mustang 2 until April 5, 2019—approximately one year after fundraising began for the project. Cannon also never converted the Shawnee 1 to a saltwater disposal well and never finished recompleting the Shawnee 3.

38. Cannon and Baker stopped providing investor updates on Cannon's projects in the spring of 2019. Baker and Cannon's salesmen also stopped responding to investor calls and emails. Nevertheless, Baker continued to pitch these projects to prospective investors until September 2020.

**G.   Cannon sold securities through unregistered brokers who received transaction-based compensation.**

39. From January 2018 to September 2020, Cannon employed 18 salesmen, including Kim. Kim worked at Cannon from late 2017 until July 2019, while all of Cannon's other salesmen each worked for no more than three to four months.

40. Cannon's salesmen solicited investors for the Mustang 2 and Shawnee 5 wells. They were paid a commission when they successfully closed a sale. Baker and Bowen also directly solicited investors and received commissions. Along with Kim, they were Cannon's highest paid salesmen—with Baker receiving approximately $405,000 in commissions, Bowen receiving approximately $106,000, and Kim receiving approximately $83,000. None of Cannon's salesmen—including Baker, Bowen, and Kim—were registered as brokers.

41. The commissions were not based on a set percentage. Instead, Bowen, as the sales manager, decided the amount Cannon would pay its salesmen for each sale.

42. From March 18, 2018 (when the Commission issued its order barring Bowen

from selling securities) to September 2018 (when Bowen left Cannon), Bowen solicited investors for Cannon in violation of the Commission's order. To conceal his conduct, Bowen directed Cannon to pay his transaction-based compensation to MAI Services, a separate entity that he owned and controlled.

**H.     Baker orchestrated a separate fraud through NTX.**

43.     While conducting Cannon's business, Baker also owned and controlled a separate company (NTX) that sold and brokered the sale of mineral interests. In June 2019, Baker solicited an investor who was interested in investing in a mineral interest. Baker persuaded the investor to purchase a mineral interest that NTX purported to own in Belmont County, Ohio.

44.     Baker drafted an NTX offering brochure for the Ohio property that gave the appearance that NTX owned mineral interests on a 17.4-acre tract in Belmont County. The Ohio property, described in the brochure as being "in the heart of the Utica Gas Shale Acreage," was allegedly unitized with two existing horizontal wells operated by a well-known operator. The brochure stated that NTX was offering four units in this acreage, at a cost of $249,230.88 per unit. NTX's brochure provided no background information about NTX or Baker, and omitted the same material information described above in Paragraph 32 about Baker, his association with Cannon, and the sanctions imposed against Cannon.

45.     Baker convinced the investor to purchase a partial unit in the Belmont County mineral interest for $126,000. To fund the investment, Baker convinced the investor to open a self-directed IRA, which allowed the investor to tap into his retirement savings. In June 2019, the investor wired $126,000 to his self-directed IRA, with instructions to send the money to NTX, which was done.

*SEC v. William Glen Baker, et al.*
Complaint                                                                                                              Page 13

46. At the time of the sale, however, neither NTX nor Baker owned the mineral interest that NTX sold to the investor. But Baker kept the investor's money. After NTX received the $126,000, Baker transferred at least $80,000 to Cannon's general operating account. Baker spent nearly all of the $126,000 on expenses unrelated to NTX and various personal expenses, including expensive meals, entertainment, and medical bills.

47. Whenever the investor asked Baker when he would receive a deed reflecting his ownership of the mineral interest, Baker lied. Baker claimed he was waiting on the well operator to complete the assignment paperwork. Baker and NTX never owned any interest in this Ohio property, and therefore Baker never sent the requested paperwork.

## V.
## CLAIMS FOR RELIEF

### FIRST CLAIM

**Fraud in Connection with the Purchase or Sale of Securities
Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]**

**(Against Defendants Baker, Bowen, Cannon, and NTX)**

48. Plaintiff repeats and incorporates by reference Paragraphs 1 through 47 of this Complaint as if set forth *verbatim* herein.

49. By engaging in the conduct described above, Defendants Baker, Bowen, Cannon, and NTX, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or the mails, have:

   a.   employed a device, scheme, or artifice to defraud; and/or

  b.  made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

  c.  engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

50. Defendants Baker, Bowen, Cannon, and NTX engaged in the above-referenced conduct knowingly or with severe recklessness.

51. By engaging in the conduct described above, Defendants Baker, Bowen, Cannon, and NTX have violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

**(Against Defendants Baker, Bowen, Cannon, and NTX)**

52. Plaintiff repeats and incorporates by reference Paragraphs 1 through 47 of this Complaint as if set forth *verbatim* herein.

53. By engaging in the conduct described above, Defendants Baker, Bowen, Cannon, and NTX, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

  a.  employed a device, scheme, or artifice to defraud; and/or

  b.  obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the

    statements made, in light of the circumstances under which they were made, not misleading; and/or

 c. engaged in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

54. With respect to violations of Section 17(a)(1), Defendants Baker, Bowen, Cannon, and NTX acted knowingly or with severe recklessness.  With respect to violations of Sections 17(a)(2) and (3), Defendants acted knowingly, recklessly, or negligently.

55. By engaging in the conduct described above, Defendants Baker, Bowen, Cannon, and NTX have violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities
### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a) & 77e(c)]

**(Against Defendants Baker, Bowen, Cannon, and NTX)**

56. Plaintiff repeats and incorporates by reference Paragraphs 1 through 47 of this Complaint as if set forth *verbatim* herein.

57. By engaging in the conduct described above, Defendants, directly or indirectly, singly or in concert with others:

 a. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell a security, through the use or medium of any prospectus or otherwise, without a registration statement in effect as to such security; and/or

 b. carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the

purpose of sale or for delivery after sale, without a registration statement in effect as to such security; and/or

   c. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, any security without a registration statement

58. By engaging in the conduct described above, Defendants Baker, Bowen, Cannon, and NTX violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)].

## FOURTH CLAIM FOR RELIEF

### Offer and Sale of Securities by Unregistered Brokers
### Violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]

**(Against Defendants Baker, Bowen, and Kim)**

59. Plaintiff repeats and incorporates by reference Paragraphs 1 through 47 of this Complaint as if set forth *verbatim* herein.

60. By engaging in the conduct described above, Defendants Baker, Bowen, and Kim each acted as brokers within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(4)], and made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security, in violation of Section 15(a) of the Exchange Act.

61. By engaging in the conduct described above, Defendants Baker, Bowen, and Kim have violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

(1) Make findings that Defendants committed the violations alleged in the Complaint;

(2) Permanently enjoin Defendants Baker, Bowen, Cannon, and NTX from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(3) Permanently enjoin Defendants Baker, Bowen, and Kim from future violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

(4) Permanently enjoin Defendants Baker and Bowen from directly or indirectly, including but not limited to, through any entity owned or controlled by each of them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Baker or Bowen from purchasing or selling securities listed on a national securities exchange for each's own personal account;

(5) Permanently enjoin Defendant Kim from directly or indirectly, including but not limited to, through any entity owned or controlled by him, soliciting any person or entity to purchase or any security; provided, however, that such injunction shall not prevent Kim from purchasing or selling securities for his own personal account;

(6) Order each Defendant to disgorge all net profits obtained as a result of each Defendant's illegal conduct alleged herein, with prejudgment interest, and ordering Baker and Cannon to disgorge their net profits jointly and severally, and ordering Baker and NTX to disgorge their net profits jointly and severally;

(7) Order each Defendant to pay a civil penalty under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(8) Order that Baker and Bowen be barred, pursuant to Section 20(e) Securities Act

[15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(9) Grant such other and further relief as the Court may deem just, equitable, and proper.

Dated:   June 30, 2022.                                  Respectfully submitted,

 /s/ *Janie L. Frank*
JANIE L. FRANK
Texas Bar No. 07363050
JAMES E.  ETRI
Texas Bar No. 24002061
JEANEEN KAPPELL
Texas Bar No. 24069656

SECURITIES AND EXCHANGE COMMISSION
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6478 (jlf phone)
(817) 978-4927 (facsimile)
frankj@sec.gov
etrij@sec.gov
kappellj@sec.gov