IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| MICHAEL BOWEN and CHOL KIM a/k/a BRANDON KIM, | § § § | Civil Action No. 3:22-cv-1415-S |
| Defendants. | § § § | |

## FIRST AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this First Amended Complaint against Defendants Michael Bowen ("Bowen") and Chol Kim a/k/a/ Brandon Kim ("Kim") (collectively "Defendants"), and respectfully shows the Court as follows:

## I.
## SUMMARY

1. Between January 2018 and September 2020, William Glen Baker ("Baker"), Bowen, and Cannon Operating Company LLC ("Cannon") raised approximately $2,182,687 from at least 140 investors through the fraudulent and unregistered offer and sale of securities—four offerings of working interests in oil and gas wells in Oklahoma. In one of these offerings—the drilling of a new well, the Mustang 2—the written offering materials, drafted by Baker and Bowen, misrepresented the track record and performance of Cannon's prior wells in the same field, failed to disclose that sales commissions would be paid, and misstated how investor funds would be used.

2. Baker and Cannon also improperly commingled Mustang 2 investor funds with funds invested in the other wells. Further, Cannon, as directed by Bowen, used investor funds to pay Baker, Bowen, Kim (a Cannon salesman), and Cannon's other salesmen undisclosed sales commissions. Furthermore, Bowen instructed Cannon's business director to conceal the true nature of those commission payments in Cannon's books and records. Baker, who controlled Cannon's bank accounts, also misappropriated investor funds to pay personal and non-business expenses, including travel, dining, and entertainment. Baker's expenditures vastly exceeded the 15% cap on investor funds the Mustang 2 offering materials earmarked for overhead and offering expenses. Finally, Baker, Bowen, and Kim offered and sold Cannon's Mustang 2 offering without being registered as brokers.

3. The other three offerings for which investor funds were raised involved the drilling of another new well, the conversion of an existing well into a saltwater disposal well, and the recompletion of another existing well into a different producing zone. For these offerings, Cannon and Baker communicated the material terms to prospective investors through phone calls and emails, using simplified descriptions of the well projects. Bowen participated in this conduct for the two offerings that occurred while he was at Cannon. Cannon and Baker, however, did not use the investor funds they raised for the stated purposes of these projects. Moreover, Baker, Bowen, and Kim received commissions which violated the federal securities laws in connection with some, or all, of these offerings.

## II.
## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action under Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d),

21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

5. The Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

6. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the transactions, acts, practices, and courses of conduct alleged in the Complaint occurred within this District. In addition, venue is proper in this District because all the Defendants reside, conduct business, and/or maintain principal places of business within the District.

### III.
### DEFENDANTS

7. **Michael Bowen**, age 41, resides in Dallas, Texas. He was the chief operating officer and sales manager of Cannon from April 2016 until he departed in September 2018 to become the president of an unrelated oil and gas company. In 2016, the Commission instituted administrative and cease-and-desist proceedings against Bowen alleging that he sold securities issued by a number of companies, including Breitling Oil and Gas Corporation ("Breitling"), Crude Energy, LLC, and Patriot Energy, Inc., in unregistered offerings, and sold securities without being registered as a broker. In 2018 and 2019, the Commission determined, in connection with the 2016 litigation and in response to Bowen's settlement offers, that Bowen had willfully violated Section 15(a) of the Exchange Act and Sections 5(a) and 5(c) of the Securities Act and: (a) ordered him to cease-and-desist from selling securities without being registered as a broker, in violation of Section 15(a) of the Exchange Act, and from selling

securities in unregistered offerings, in violation of Sections 5(a) and 5(c) of the Securities Act; (b) ordered him to pay $2,036,012.96 in disgorgement and prejudgment interest (which he has not paid); (c) ordered him to pay a $50,000 civil penalty (which he has not paid); and (d) barred him from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal adviser, transfer agent, or nationally recognized statistical rating organization and prohibited him from serving or acting as an employee, officer, director, or member of an advisory board, investment adviser, or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter. *In the Matter of Robert L. Baker, et al.*, Securities Act Release No. 10665, 2019 WL 3484124 (July 24, 2019); Securities Act Release No. 10471, 2018 WL 10392765 (March 22, 2018); Securities Act Release No. 10264, 2016 WL 7156449 (December 8, 2016). Bowen does not hold any securities licenses and is not registered with the Commission in any capacity.

8. **Chol Kim a/k/a/ Brandon Kim**, age 43, resides in Dallas, Texas. He is a former salesman for Cannon and North Texas Minerals LLC ("NTX"). Kim does not hold any securities licenses and is not registered with the Commission in any capacity.

### IV.
### FORMER DEFENDANTS

9. **William Glen Baker**, age 53, resides in Terrell, Texas. He was the owner, managing member, and president of both Cannon and NTX. In 2006, Baker was convicted in Dallas County, Texas, for unlawfully carrying a weapon and drug-related charges. In 2020, the Ohio Division of Securities issued a cease-and-desist order against Baker for selling securities without a license. Baker does not hold any securities licenses and is not registered with the Commission in any capacity. On April 12, 2023, the Court issued a Final Judgment against Baker.

10. **Cannon Operating Company LLC** was a Texas limited liability company founded and owned by Baker, with its principal place of business in Garland, Texas. Cannon was incorporated on October 20, 2009, as an oil and gas exploration and production company. It has been sanctioned by multiple state securities regulators, including: (1) in 2015, by South Carolina, for selling unregistered securities through unlicensed agents and engaging in a scheme to defraud; (2) in 2019, by Indiana, for offering or selling unregistered securities through a scheme to defraud (Cannon was ordered to pay more than $210,000 in restitution and penalties and was barred from the state's securities industry); and (3) in 2020, by Ohio, for selling securities through unlicensed salesmen and failing to disclose Baker's prior felony convictions and Cannon's prior administrative orders. Neither Cannon, its securities, nor its securities offerings have ever been registered with the Commission. Cannon has ceased operations and its charter was forfeited pursuant to Section 171.309 of the Texas Tax Code. On February 7, 2023, the Commission voluntarily dismissed its claims against Cannon.

11. **North Texas Minerals LLC** was a Texas limited liability company that Baker formed in 2017. Baker owned and controlled NTX, which maintained its principal place of business in Garland, Texas. Neither NTX nor its securities offerings have ever been registered with the Commission. NTX has ceased operations and its charter was forfeited pursuant to Section 171.309 of the Texas Tax Code. On February 7, 2023, the Commission voluntarily dismissed its claims against NTX.

## V.
## FACTS

12. In 2009, Baker founded Cannon and, through it, offered and sold working interests in oil and gas prospects in Texas, Louisiana, and Oklahoma to investors nationwide. These oil and gas working interests constituted securities under the statutory definitions in the

federal securities laws. In addition, Cannon's offerings constituted "investment contracts" under the federal securities laws because Cannon's investors purchased their working interests with personal checks, wire transfers, or through self-directed IRA accounts, for the purpose of investing in a "common enterprise" to earn profits from oil and gas production based on the efforts and expertise of Cannon and its employees.

13. In January 2018, Cannon and Baker began raising money for four separate well offerings in the Shawnee Field in Pottawatomie County, Oklahoma, where Cannon already operated several wells. These four projects included:

- Mustang 2: This project was for a new well to be drilled in the Shawnee Field and was the tenth Cannon-sponsored oil and gas drilling program.

- Shawnee 1: Cannon had previously drilled this well but proposed converting it to a saltwater disposal well.

- Shawnee 3: Cannon had previously drilled this well but proposed recompleting the well into another producing zone.

- Shawnee 5: This project was for a new well to be drilled in the Shawnee Field.

14. From approximately April 2016, when Bowen joined Cannon, through September 2018, when Bowen departed the company, Baker and Bowen had an unwritten agreement to be "50/50 partners" in the business. According to that agreement, Baker was responsible for Cannon's operations, i.e., its oil and gas drilling and production, while Bowen oversaw the company's sales and marketing efforts. Soon after he joined Cannon, Bowen insisted that the company only offer and sell oil and gas working interests, as opposed to its prior practice of offering and selling joint venture interests.

**A.    Cannon, Baker, Bowen, and Kim solicited investors.**

15.    From approximately January 2018 to September 2020, Cannon raised $2,182,687 from at least 140 investors in 42 states in connection with these four unregistered securities offerings (the "Cannon Offerings"):

| Well | Investor Funds Raised |
|---|---|
| Mustang 2 | $1,538,152 |
| Shawnee 1 | $164,812 |
| Shawnee 3 | $89,128 |
| Shawnee 5 | $13,750 |
| Unclear[1] | $376,845 |
| **Total** | **$2,182,687** |

16.    For the Mustang 2 and the Shawnee 5 wells, Cannon salesmen solicited prospective investors by cold-calling potential investors from purchased lead lists. Cannon also generally advertised investment opportunities on the company's website and used targeted internet marketing like Google Ads and Facebook.

17.    From January 2018 to September 2020, Cannon employed 18 salesmen, including Kim. Even though Baker and Bowen were officers of Cannon, they also directly solicited investors. None of Cannon's salesmen, including Baker, Bowen, and Kim, were registered as brokers.

18.    Because the Shawnee 1 and 3 projects involved the conversion and recompletion of existing wells, Cannon, Baker, and Bowen contacted existing Cannon investors, including

---

[1]   For these investor funds, it is not possible to determine the specific offering the investors purchased because Cannon and Baker commingled investor funds and because investors did not specify on their check or wire transfer the well to which their payment pertained.

those who had originally invested in the Shawnee 1 and 3 wells, to solicit their investment and participation in these subsequent operations.

**B.    Baker and Bowen created the Mustang 2 offering materials.**

19.    During the spring of 2018, Baker and Bowen prepared the written offering materials for the Mustang 2 well. Baker and Bowen used the Mustang 1 offering documents as a starting point and exchanged drafts with each other and discussed the proposed changes amongst themselves until they were both satisfied with their work product—consistent with their equal partnership. Baker and Bowen finalized the Mustang 2 offering documents on or about April 25, 2018. The written materials included a Private Placement Memorandum ("PPM") and a marketing brochure referred to as the "Prospect Book." From approximately April 2018 until September 2018, Cannon, Baker, Bowen, Kim, and the other Cannon salesmen sent these two documents (collectively, the "Mustang 2 Offering Materials") to prospective investors. In or around April 2018, Bowen sent the Mustang 2 Offering Materials to all of Cannon's Mustang 1 investors—approximately 33 individuals located in 16 states.

20.    When raising funds for additional work on the Shawnee 1 and 3 projects, Baker prepared single-page information sheets rather than formal offering materials. These information sheets described, respectively, the conversion and recompletion projects. Cannon and Baker sent these one-page summaries, along with an election form, to Cannon's existing investors. If investors chose to participate in the production generated by the subsequent operations, they returned the completed election form along with their investment.

21.    Cannon did not prepare formal written materials for the Shawnee 5 project either. Instead, Baker provided generic information about this proposed new well to the salesmen for them to convey to prospective investors during their telephone solicitations.

C.  **Cannon's Mustang 2 Offering Materials contained misleading information.**

*Historical production*

22. The Mustang 2 Prospect Book contained misleading information about the actual production of oil and gas from three of Cannon's prior wells—the Shawnee 2, 3, and 4 wells. These wells were in the same field as the Mustang 2 well's proposed location. Cannon's Mustang 2 Prospect Book claimed that Cannon's Shawnee 2, 3, and 4 wells had high initial production when they were first drilled and that they "continued to produce at massive rates"—a claim which was drafted and/or approved by Bowen during the spring of 2018. This representation misled investors into believing that production from the Mustang 2 would also be high.

23. Actual production from the earlier three Shawnee wells, however, declined dramatically after the initial production. Baker and Bowen knew this: offering materials for an earlier 2016 Cannon project (the Shawnee 2 Field Prospect which involved offsets to the Shawnee 2, 3, and 4 wells) had accurately described the production declines of the Shawnee 2 and 3 wells in detail. Bowen knew, or was severely reckless in not knowing, the actual Shawnee production information because he used the Shawnee 2 Field Prospect offering documents to solicit potential investors from approximately February 2017 through February 2018.

24. Cannon received monthly production information for all its wells. During the entire time Bowen worked at Cannon, Baker and Bowen met at least one to two times per month to discuss Cannon's current production numbers. Moreover, Bowen, who had access to all of Cannon's production information, regularly accessed the data from the company's servers in response to investor information requests. Accordingly, Baker and Bowen knew, or were severely reckless in not knowing, when they drafted the Mustang 2 Offering Materials that the

Shawnee 2, 3, and 4 wells had not been "massively" producing. In fact, the Shawnee 2 and 3 wells had not produced at all during March and April 2018 because they were offline. Baker and Bowen omitted these details from the Mustang 2 Offering Materials and falsely represented that the wells had continued to produce at "massive rates." As previously discussed, Bowen sent the Mustang 2 Offering Materials to all Mustang 1 investors.

**D.     Cannon, Baker, and Bowen did not use investor funds as represented.**

25.     The Mustang 2 PPM stated that Cannon would use 85% of investor funds for "Program Costs" and 15% for a "Management Fee." According to the PPM, Program Costs included the drilling and testing of the well, completion costs, third-party geological, engineering, and consulting expenses, and land costs. The Management Fee, according to the PPM, included offering, overhead, and management expenses associated with the initial operations. The PPM did not define what was included in the term "overhead."

26.     Cannon did not spend investor funds as promised in the PPM. Due to the commingling of investor funds from multiple projects, combined with poor recordkeeping for all the projects, it is not possible to tell exactly how much Cannon spent on Mustang 2, or any other well project. Regardless, Cannon's offering, overhead, and management expenses on the Mustang 2 vastly exceeded the 15% cap.

27.     Baker misused $691,756 of investor funds in the Cannon account on various personal expenses such as retail shopping, travel, meals, entertainment, child support, medical bills, and car expenses. In some cases, Baker withdrew cash from Cannon, while other times he directed Cannon to purchase the personal items directly.

28.     Bowen misused investor funds from January through September 2018 because, as Cannon's chief operating officer and sales manager, he was in charge of paying commissions to

the company's salesmen on the completed sales. Bowen knew, or was severely reckless in not knowing, that the commissions were not authorized by the offering materials or disclosed to investors because: 1) he instructed Cannon's business director, soon after he joined the company, to conceal the payment of commissions in Cannon's books and records (as described below in paragraph 39); and 2) he and Baker drafted the Mustang 2 Offering Materials during the spring of 2018 and subsequently sent them to potential investors, including the Mustang 1 investors. Due to his prior violations in connection with the Breitling securities offerings (as detailed above in paragraph 7), Bowen also knew that the payment of commissions to unregistered salesmen for sales of oil and gas working interests violated Section 15(a) of the Exchange Act. Moreover, even if the Mustang 2 Offering Materials had disclosed the commissions (assuming *arguendo* that the commissions could have been classified as being within the scope of the Management Fee's offering, overhead, and management expenses associated with initial operations) the commission payments would have caused Cannon to exceed its 15% Management Fee.

### E.   Cannon's offering materials omitted material information.

29.   The Mustang 2 Offering Materials, which were drafted and approved by Baker and Bowen, omitted material background information about Cannon, Baker, and Bowen.

30.   The Mustang 2 Offering Materials failed to mention Bowen whatsoever, including that he was Cannon's chief operating officer and sales manager and Baker's "50/50 partner" in the business. This omission was designed to prevent investors from learning that the Commission had instituted administrative and cease-and-desist proceedings against Bowen and had sanctioned him prior to the documents' finalization on or about April 25, 2018. Bowen knew, or was severely reckless in not knowing, about this omission because, together with Baker, he drafted and approved the Mustang 2 Offering Materials and sent them to potential

investors, including the Mustang 1 investors.

31.     The Mustang 2 Offering Materials also failed to disclose other material, negative information, including[2]:

- Orders from the Texas Railroad Commission against Cannon for violating surface equipment removal regulations (2013) and for safety and pollution control regulations (2015).

- A 2015 cease-and-desist order from the South Carolina Securities Commissioner against Cannon for selling unregistered securities.

- Baker's 2006 conviction in Dallas County, Texas, for unlawfully carrying a weapon and various drug-related charges.

Bowen knew this negative information before he drafted and disseminated the Mustang 2 Offering Materials to investors because Baker had disclosed it all to Bowen prior to Bowen joining Cannon in or around April 2016.

32.     Cannon, Baker, and Bowen additionally failed to disclose that investor funds would be used to pay commissions—the payment of which was Cannon's standard practice even before Bowen joined Cannon and continued throughout Bowen's time at the company and after he departed. While at Cannon, Bowen oversaw the company's sales and marketing efforts and, as part of those responsibilities, determined the amount of commission paid on each sale, including payments to Baker and Bowen for their respective sales. Baker and Bowen also prepared the Mustang 2 Offering Materials (which Bowen sent to the Mustang 1 investors and others), and Baker prepared information sheets for Shawnee 1 and 3, none of which included a reference to the payment of commissions. As a result, Cannon, Baker, and Bowen knew, or were

---

[2] The Mustang 2 Offering Materials also contained inconsistent information. The PPM touted Baker's years of oil and gas experience, claiming Baker had been "in the oil and gas business for 18 years," and that he "has drilled and completed over 150 wells" since 1999. However, the Prospect Book claimed that Baker had drilled and completed more than 350 wells.

severely reckless in not knowing, that Cannon's offering materials failed to disclose to investors the payment of sales commissions.

F. **Bowen made material misrepresentations and omissions during a Mustang 2 sales call.**

33. In or about July 2018, a resident of Maryland ("Investor A") saw a Cannon investment advertisement on Facebook. In response to the advertisement, Investor A contacted Cannon through Facebook. In or about late-July 2018, Bowen called Investor A and presented a sales pitch to him regarding Cannon's Mustang 2 offering. During the conversation, which lasted approximately 15 to 20 minutes, Investor A questioned Bowen regarding the success of Cannon's prior wells because Investor A was skeptical of oil and gas investments. Bowen told Investor A that all of Cannon's prior wells were profitable, "had lots of production," and would generate "manyfold returns" for Investor A. Bowen did not tell Investor A that the Shawnee 2, 3, and 4 wells had performed very poorly, or that the Shawnee 2 and 3 wells were offline in March and April 2018 (discussed above in section V.C.). Investor A would not have invested in Mustang 2 had he known this information.

34. Investor A also asked Bowen if Cannon or its employees had any history of legal or regulatory problems. Bowen told Investor A that there were no such issues. Bowen did not disclose his March 22, 2018, Commission order to Investor A. Bowen also did not disclose to Investor A either Cannon's regulatory history or Baker's criminal background. Investor A would not have invested in Mustang 2 had he known this information.

35. While Bowen told Investor A that Cannon would use investor funds to perform a final analysis and assessment of Mustang 2 and to drill the well, Bowen did not tell Investor A that investor funds would also be used to pay commissions to Bowen, Baker, and/or Cannon's unregistered salesmen. Investor A thought that Baker, Bowen, and the salesmen were all salaried

employees of Cannon. This omission was significant to Investor A because he believed that salesmen who receive commissions are incentivized to only share positive information with potential investors.

36. On or about July 25, 2018, and as a direct result of Bowen's material misrepresentations and omission to him, Investor A invested $30,000 in Mustang 2. Investor A, who was not an accredited investor, lost his entire investment.

**G. Cannon sold securities through unregistered brokers who received transaction-based compensation.**

37. From January 2018 to September 2020, Cannon employed 18 salesmen, including Kim. Kim worked at Cannon from late 2017 until July 2019, while all of Cannon's other salesmen each worked for no more than three to four months.

38. Cannon's salesmen solicited investors for the Mustang 2 and Shawnee 5 wells. They were paid a commission when they successfully closed a sale. Baker and Bowen also directly solicited investors and received commissions. Along with Kim, they were Cannon's highest paid salesmen—with Baker receiving approximately $405,000 in commissions, Bowen receiving approximately $106,000, and Kim receiving approximately $83,000. None of Cannon's salesmen—including Baker, Bowen, and Kim—were registered as brokers.

39. The commissions were not based on a set percentage. Instead, Bowen, as Cannon's chief operating officer and sales manager, decided the amount the company would pay its salesmen for each sale. From around the time he joined Cannon in April 2016 until he left the company in September 2018, Bowen—to conceal the commissions from state and federal securities regulators or anyone else who might examine Cannon's books and records—provided Cannon's business director with a slip of paper with the amount of commission to pay a particular salesman for a sale, or a verbal instruction regarding same. To ensure that the scheme

would remain concealed, Bowen instructed the business director to never record the payments as commissions in Cannon's books and records. Bowen also directed Cannon's business manager to pay all his transaction-based compensation to MAI Services, a separate entity owned and controlled by Bowen, to further disguise Cannon's payment of commissions.

40. From March 22, 2018 (when the Commission ordered Bowen to cease-and-desist from violating Securities Act Sections 5(a) and 5(c) and Exchange Act Section 15(a)) to September 2018 (when Bowen left Cannon), Bowen solicited investors for Cannon's unregistered securities offerings, and received commissions for the resulting sales, in violation of the Commission's order—including by soliciting the Mustang 1 investors for the Mustang 2 offering in or around April 2018 and by soliciting Investor A in or around July 2018.

**VI.
CLAIMS FOR RELIEF**

**FIRST CLAIM**

**Fraud in Connection with the Purchase or Sale of Securities
Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]**

**(Against Defendant Bowen)**

41. Plaintiff repeats and incorporates by reference Paragraphs 1 through 40 of this First Amended Complaint as if set forth *verbatim* herein.

42. By engaging in the conduct described above, Defendant Bowen, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or the mails, has:

    a. employed a device, scheme, or artifice to defraud; and/or

   b. made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c. engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

43. Defendant Bowen engaged in the above-referenced conduct knowingly or with severe recklessness.

44. By engaging in the conduct described above, Defendant Bowen has violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

**(Against Defendant Bowen)**

45. Plaintiff repeats and incorporates by reference Paragraphs 1 through 40 of this First Amended Complaint as if set forth *verbatim* herein.

46. By engaging in the conduct described above, Defendant Bowen, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, has:

   a. employed a device, scheme, or artifice to defraud; and/or

   b. obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were

     made, not misleading; and/or

   c. engaged in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

47. With respect to violations of Section 17(a)(1), Defendant Bowen acted knowingly or with severe recklessness. With respect to violations of Sections 17(a)(2) and (3), Defendant Bowen acted knowingly, recklessly, or negligently.

48. By engaging in the conduct described above, Defendant Bowen has violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**[15 U.S.C. §§ 77e(a) & 77e(c)]**

**(Against Defendant Bowen)**

49. Plaintiff repeats and incorporates by reference Paragraphs 1 through 40 of this First Amended Complaint as if set forth *verbatim* herein.

50. By engaging in the conduct described above, Defendant Bowen, directly or indirectly, singly or in concert with others:

   a. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell a security, through the use or medium of any prospectus or otherwise, without a registration statement in effect as to such security; and/or

   b. carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale, without a

     registration statement in effect as to such security; and/or

  c.  made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, any security without a registration statement.

51. By engaging in the conduct described above, Defendant Bowen violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)].

## FOURTH CLAIM FOR RELIEF

### Offer and Sale of Securities by Unregistered Brokers
### Violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]

**(Against Defendants Bowen and Kim)**

52. Plaintiff repeats and incorporates by reference Paragraphs 1 through 40 of this First Amended Complaint as if set forth *verbatim* herein.

53. By engaging in the conduct described above, Defendants Bowen and Kim each acted as brokers within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(4)], and made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security, in violation of Section 15(a) of the Exchange Act.

54. By engaging in the conduct described above, Defendants Bowen and Kim have violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

(1) Make findings that Defendants committed the violations alleged in the First Amended Complaint;

(2) Permanently enjoin Defendant Bowen from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(3) Permanently enjoin Defendants Bowen and Kim from future violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

(4) Permanently enjoin Defendant Bowen from directly or indirectly, including but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Bowen from purchasing or selling securities listed on a national securities exchange for his own personal account;

(5) Permanently enjoin Defendant Kim from directly or indirectly, including but not limited to, through any entity owned or controlled by him, soliciting any person or entity to purchase or any security; provided, however, that such injunction shall not prevent Kim from purchasing or selling securities for his own personal account;

(6) Order each Defendant to disgorge all net profits obtained as a result of each Defendant's illegal conduct alleged herein, with prejudgment interest;

(7) Order each Defendant to pay a civil penalty under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(8) Order that Bowen be barred, pursuant to Section 20(e) Securities Act [15 U.S.C. §

77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(9) Grant such other and further relief as the Court may deem just, equitable, and proper.

Dated:   October 12, 2023.                     Respectfully submitted,

 /s/ *Jason J. Rose*
JASON J. ROSE
Texas Bar No. 24007946
JAMES E. ETRI
Texas Bar No. 24002061
JEANEEN KAPPELL
Texas Bar No. 24069656

SECURITIES AND EXCHANGE COMMISSION
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-1408 (jjr phone)
(817) 978-4927 (facsimile)
rosej@sec.gov
etrij@sec.gov
kappellj@sec.gov

## CERTIFICATE OF SERVICE

I certify that on October 12, 2023, I electronically submitted the foregoing document to the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court, which served those counsel of record for parties who have appeared.

/s/ *Jason J. Rose*
Jason J. Rose